**Thomas M. GAUBERT, Plaintiff,**

v.

**Edwin GRAY, et al., Defendants.**

**Civ. A. No. 87–3500.**

United States District Court,
District of Columbia.

Aug. 27, 1990.

Abbe David Lowell, Brand & Lowell, Washington, D.C., for plaintiff.

Elizabeth Moore, Civ. Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter is before the Court on defendants' Motion to Dismiss. After having reviewed defendants' motion, plaintiff's response thereto, and after having heard oral argument from the parties, this Court is prepared to rule on the Motion.

## I. BACKGROUND

Plaintiff, formerly the largest single shareholder of Independent American Savings Association ("IASA"), a savings and loan located in Irving, Texas, initiated this action against officials of the Federal Home Loan Bank Board ("FHLBB"), the Federal Savings & Loan Insurance Corporation ("FSLIC"), and the Federal Home Loan Bank of Dallas, Texas ("FHLB–D") alleging constitutional and common law torts. Plaintiff is seeking $76 million in compensatory damages and $100 million in punitive damages.

The defendants all of whom are being sued in their individual capacities,[1] include Edwin Gray, then-Chairman of the Bank of the Bank Board; Shannon Fairbanks, Chief of Staff and Executive Director; Norman Raiden, General Counsel; William Black, an Associate General Counsel and Deputy Director of FSLIC; William J. Schilling, Director of the Bank Board's Office of Examinations and Supervision; Rosemary Stewart, Director of the Office of Enforcement; Stephen Hershkowitz and Karen Bruton, both staff members in the Office of Enforcement; Louis V. Roy, Senior Vice President and Senior Supervisory Agent at the FHLB–D; Robert S. Bonchak, Vice President and Director of Supervision at FHLB–D; and Allen Dermody, Vice President and Director of Corporate Affairs at FHLB–D. Plaintiff also is suing certain yet to be identified Doe defendants.

Plaintiff's complaint sets forth the following factual background:[2]

In 1984, Investex Savings of Tyler, Texas ("Investex"), a FSLIC insured S & L, faced the possibility of financial collapse. FHLBB and Federal Home Loan Bank of Dallas ("FHLB–D") officials estimated that the failure of Investex would result in a $40 to $50 million loss to the FSLIC. Complaint ¶ 28. The officials with oversight responsibility for Investex set out to find a "a non-FSLIC-assisted solution" to the S & L's financial problems, i.e. a solution that

---

1. The titles of each of the named defendants correspond to the positions that each individual held at the time the alleged improper actions occurred.

2. For purposes of defendants' Motion to Dismiss, the facts as alleged in plaintiff's complaint are taken as true.

would protect the assets of Investex depositors while not requiring the FSLIC to bailout the S & L. *Id.* ¶ 29. One possibility the officials at the FHLB–D considered was merging Investex with another S & L. The primary candidate for such a merger was Independent American Savings Association ("IASA"), a FSLIC-insured thrift located in Irving, Texas.[3] *Id.* ¶ 30.

The controlling interest in IASA was held by Thomas Gaubert. *Id.* ¶ 1. Mr. Gaubert had previously worked with FHLB–D officials in an attempt to rescue another failing Texas S & L and had expressed interest in participating in other S & L mergers. *Id.* ¶¶ 16–25; *see also* Transcript of Motion to Dismiss Hearing, Nov. 16, 1988 ("Transcript") at 17–18.[4]

After an analysis of a possible Investex—IASA merger, the FHLB–D officials determined that IASA would have to grow if it was to successfully acquire and then support Investex. Complaint, ¶ 31. In particular, FHLB–D officials were concerned with IASA's ability to absorb Investex's losses. FHLB–D officials concluded that the growth could be accomplished if IASA purchased a number of branches of United Savings of Houston ("United"). *Id.* In September of 1984, based at least in part on the FHLB–D analysis and the information provided to IASA by FHLB–D, plaintiff concluded that the merger would succeed. Accordingly, IASA made an application for the acquisition of Investex and United. Complaint ¶¶ 31–32; *see also* Transcript at 18.

During the same time period and in connection with plaintiff's application to acquire Investex and United, Robert Salter, an analyst at FHLB–D, reviewed the merger proposal. It was Mr. Salter's conclusion that IASA could not absorb the losses of Investex and that the merger would not be advisable. Salter recommended to defendants Roy, Dermody and Bonchak that the IASA application be denied. *Id.* ¶ 44. Fur-

ther, Salter told William O. Churchill, who is not a party to this action, that the acquisition would result in the collapse of IASA. Salter's superiors, defendant's Roy and Dermody, did not follow Salter's suggestion. Neither Roy nor Dermody advised the plaintiff of Salter's analysis or their decision to reject it. *Id.* ¶ 45.

Defendant Roy discussed Salter's views with defendants Raiden, Schilling, Stewart and others. These defendants understood the risks involved, namely that the IASA–Investex merger might fail and oblige the FSLIC to incur a multi-million dollar loss. In an attempt to avoid this eventuality, defendants Raiden and Schilling directed Roy "to require Gaubert to guarantee the net worth of IASA...." *Id.* ¶ 46. Although requiring a guarantee is not the practice of the FHLBB, Defendant Roy erroneously indicated to plaintiff Gaubert that it was routine. *Id.* at ¶ 48. Plaintiff agreed to the guarantee. *Id.* at ¶ 49.

About the same time the Investex and United acquisitions were being processed, certain of the defendants became aware of plaintiff's involvement in a loan transaction with an Iowa S & L. *Id.* at ¶ 33. Apparently, the FHLBB Office of Enforcement intended to commence a formal investigation into the activities of the plaintiff in relation to the Iowa S & L. *See* Transcript at 23–26. In fact, Bonchak, Roy and other FHLBB officials had already recommended that plaintiff be removed permanently from IASA and the thrift industry. Complaint ¶ 41. This recommendation was not revealed to plaintiff. *Id.* ¶ 42–43.

Although several of the defendants believed the investigation should go forward, there was general agreement that an attempt should be made to prevent any investigation or FHLBB action from interfering with the acquisition of Investex. Of particular concern was the fact that a formal investigation of plaintiff or removal of plaintiff from the industry would scuttle

---

**3.** The FHLB–D conducted a bid auction in which it contacted every qualified potential purchaser in the United States. However, no purchaser other than IASA could be found. *Id.* at ¶¶ 30–31.

**4.** In his complaint, Mr. Gaubert alleges that because of these prior dealings with FHLB–D officials these regulators "developed a prejudice against [him]." Complaint, ¶ 25.

the Investex acquisition. Complaint ¶ 34; *see also* Transcript at 24.

In order to assure the successful completion of IASA's acquisition of Investex, "defendant Roy initiated and defendants Raiden, Schilling, Bonchak, Hershkowitz and Stewart ... approved the creation of an unprecedented procedure." Complaint ¶ 35. Defendants Roy, Bonchak, Dermody and Hershkowitz suggested that "Gaubert temporarily remove himself from the day-to-day operations of IASA while the agency conducted an expeditious investigation of Gaubert's dealings with [the Iowa S & L]." *Id.* ¶ 36. This arrangement came to be known as the "neutralization agreement" and was adopted in lieu of initiating a formal investigation or removal proceeding. *Id.* ¶ 36–37.

Unlike a formal proceeding, the neutralization agreement did not require that plaintiff be formally presented with specific charges; it did not place a burden upon the agency to prove grounds existed for removal; it did not afford the plaintiff a right to confront the evidence against him or to offer evidence of his own; and, it did not result in a final decision that could be reviewed by the agency and, ultimately, by a federal court. *Id.* ¶ 37. Instead, Gaubert voluntarily removed himself from the operations of IASA. And, the defendants agreed that any investigation would be conducted expeditiously and the scope of the investigation would be limited to Gaubert's dealings with the Iowa S & L. Further, defendants agreed that if no wrongdoing came to light, the neutralization agreement would be terminated. Authority to terminate the agreement was vested solely with defendant Roy of FHLB–D. *Id.* ¶ 38–40.

Plaintiff agreed to the neutralization agreement. Plaintiff also agreed to guarantee the net worth of IASA for the term of that agreement. *Id.* ¶ 49.[5] The neutralization agreement was executed on December 18, 1984; the acquisition of the United branches occurred by the close of 1984; and the Investex—IASA merger closed in

1985. *Id.* ¶ 50. However, once the neutralization agreement was executed, the defendants failed to honor its terms. In particular, defendants Raiden, Stewart, Bruton, and Roy failed to aggressively pursue the investigation so as to ensure that the process would proceed expeditiously. As a result of these delays, the "temporary" neutralization agreement was transformed into "a permanent removal of Gaubert from the thrift industry." *Id.* at ¶¶ 51–55.

In the summer of 1985, defendants Bruton and Roy advised FHLBB officials that the investigation of the Iowa thrift did not uncover sufficient grounds for seeking the removal of Gaubert from the industry. Defendant Roy also advised Mr. Gaubert of this fact. Despite this conclusion, the defendants chose not to terminate the neutralization agreement. Instead, they decided to expand the scope of their investigation of Gaubert. *Id.* ¶ 56. Such an expansion had the effect of permanently removing Gaubert from the management of IASA. *Id.* ¶ 57.

When Gaubert learned that the initial investigation had revealed no wrongdoing, he requested that defendant Roy terminate the agreement. Roy, although he acknowledged that there was no basis to institute formal removal procedures, refused to terminate the agreement. The basis for this refusal was that Roy had been instructed by defendant Stewart not to terminate the neutralization agreement. *Id.* ¶¶ 59–61.

Even though the expanded investigation of Gaubert did not produce any evidence of wrongdoing, defendants Stewart, Bruton, Raiden, Roy, and others decided to pressure Gaubert into voluntarily removing himself from the thrift industry. Stewart advised Gaubert that she was convinced that he had violated the law and that he would continue to be investigated until she chose to initiate a formal removal proceeding. Defendants Stewart, Bruton, and Roy communicated to Gaubert that the only way for him to avoid an expansive investigation would be for him to voluntarily re-

---

5. In fact, the net worth guarantee was incorporated into the neutralization agreement. *See*

Complaint ¶¶ 47, 49.

move himself from the thrift industry. During this same time, bank board examiners began visiting officials at other savings and loans and advised them that Gaubert was the subject of an investigation. *Id.* ¶¶ 62–63. In December 1985, Gaubert signed an agreement to voluntarily remove himself permanently from IASA and any other FSLIC insured institution.

Gaubert's removal from the management of IASA had a significant detrimental impact on the S & L's financial condition. Although the Investex merger resulted in a four-fold growth of IASA (from $300 million to $1.2 billion), the merger itself was not financially sound and the inability of Gaubert to be involved in the organizations management led to instability. Recognizing IASA'a problems, the FHLBB set out to find replacement officers and directors soon after Gaubert voluntarily and permanently removed himself from the picture. A management team was assembled but their efforts proved fruitless and in the summer of 1986 they announced that IASA was insolvent having a negative net worth of over $400 million. *Id.* ¶¶ 66–72.

In the spring of 1986, plaintiff Gaubert learned for the first time that an internal FHLB–D analysis concluded that IASA would not be able to absorb the Investex losses. Gaubert made inquiries with the defendants to determine what they knew about this information. In addition, in the summer and fall of 1986, Gaubert brought his concerns about the Investex merger, the neutralization agreement, and change in IASA management to the attention of defendants Gray and Fairbanks. Gray and Fairbanks agreed to review these matters, but in actuality they made little or no attempt to undertake the process of review. *Id.* ¶¶ 73–77.

In late 1986 and 1987, the House Committee on Banking and Urban Affairs was involved in a review of the FHLBB. Gaubert sought to bring his problems with the bank board to the attention of this Congressional Committee. In response, defendants Gray, Fairbanks, Black, Stewart and others released or authorized others to release to congressional staff and reporters confidential examination reports and investigative material relating to Gaubert and IASA. *Id.* ¶¶ 78–82.

In January 1987, defendants Gray and Fairbanks retained an outside law firm to review the actions of regulatory officials regarding IASA and Gaubert. At this time, the bank board had already made the decision to put IASA into receivership. Neither Gaubert or his representatives were advised of this decision. In April 1987, the outside counsel reported its findings to defendant Gray. The report concluded that the defendants had made misstatements to Gaubert, had violated the neutralization agreement, had kept Gaubert removed from IASA management for too long a period, and had acted "unfairly and improperly" in their other dealings with him. *Id.* ¶¶ 85–87. Defendants delayed providing Gaubert with a copy of the outside counsel's report. It was not until May 20, 1987, the day IASA was closed and put into receivership, that Gaubert received a copy of the report. *Id.* ¶ 88.

## II. PLAINTIFF'S LEGAL CLAIMS

Plaintiff's complaint consists of eight counts. Counts I through III allege that defendants actions amounted to constitutional torts. Count I alleges that the actions taken by FHLBB officials amounted to a taking of plaintiff's property in violation of plaintiff's substantive due process rights. In Count II, plaintiff asserts that defendants' efforts to remove him from managing the affairs of IASA violated his rights to procedural due process. Count III alleges that through the release of information to Congress and the media defendants deprived plaintiff of his First Amendment right to petition Congress.

In Counts IV through VIII, plaintiff advances common-law tort claims. Count IV alleges that defendants made false and misleading statements to the plaintiff in an effort to induce him to undertake certain actions regarding IASA. Count V alleges that certain of the named defendants intentionally failed to disclose facts that were pertinent to the business decisions of the plaintiff. Count VI charges that certain of

the named defendants intentionally interfered with a contract entered into between plaintiff and the FHLBB. Count VII alleges that the dissemination and release of confidential information about the plaintiff and IASA constituted a tortious invasion of privacy. Count VIII asserts that each defendant acted separately and in concert, in a conspiracy with one or more of the other defendants.

## III. STANDARD FOR MOTION TO DISMISS

On a Motion to Dismiss, the complaint is construed in the light most favorable to plaintiff and its allegations are taken as true. Moreover, any ambiguities or uncertainties concerning the sufficiency of the claims must be resolved in favor of the plaintiff. *See Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1979); *see also* 5 Wright & Miller, Federal Practice & Procedure § 1357 (1969). As the Supreme Court has stated:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Thus, at this stage, plaintiff's statement of the facts must be accepted as true.

Defendants assert four bases for dismissal of plaintiff's complaint pursuant of Rule 12(b) of the Federal Rules of Civil Procedure: 1) the facts and circumstances of this case do not warrant the recognition of an implied constitutional cause of action; 2) the allegations of constitutional violations fail to state a claim upon which relief can be granted; 3) the defendants are immune from this suit and from liability for money damages; and 4) the Court lacks personal jurisdiction over defendants Roy, Bonchack and Dermody.

Because this Court finds defendants' arguments regarding immunity to be dispositive, the other issues raised by defendants in their Motion to Dismiss are not addressed in this Opinion.

## IV. IMMUNITY

This Court is acutely aware of the fact that a Motion to Dismiss summarily extinguishes litigation and forecloses the opportunity for discovery and factual presentations. Such a motion should be granted "only when it appears beyond doubt that, under any reasonable reading of the complaint, the plaintiff will be unable to prove any set of facts that would justify relief." *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C.Cir.1987). However, it is settled law that a Rule 12(b)(6) motion to dismiss may properly be granted where immunity, though technically an affirmative defense, is an issue. *See* 5 Wright & Miller, Federal Practice & Procedure § 1357.

In particular, the D.C. Circuit has recognized that the spectre of a qualified immunity defense places special burdens on the complaint at the pleading stage. *Haynesworth*, 820 F.2d at 1254 n. 71. Consequently, an inquiry into the existence, nature, and applicability of an immunity defense in this case must be undertaken to ascertain the ability of plaintiff's complaint to withstand defendants' motion to dismiss.

In general, there are two types of immunity that shield the actions of federal government officials—absolute and qualified. The doctrine of absolute immunity shields officials from being held liable for state law tort claims when the tortious actions they are alleged to have taken occurred within the outer perimeter of their official duties and were discretionary in nature. *Westfall v. Erwin*, 484 U.S. 292, 108 S.Ct. 580, 585, 98 L.Ed.2d 619 (1988). Qualified immunity insulates officials from personal liability when their alleged tortious conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware or when the alleged improper conduct was not the product of an unconstitutional motive or bad faith. *See e.g. Harlow*

*v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Smith v. Nixon,* 807 F.2d 197, 199–200 (D.C.Cir. 1986). The underlying public policy for immunizing official actions "is not to protect an erring official, but to insulate the decision-making process from the harassment of prospective litigation. The provision of immunity rests on the view that the threat of liability will make federal officials unduly timid in carrying out their official duties, and that effective Government will be promoted if officials are freed of the costs of vexatious and often frivolous damages suits." *Westfall,* 108 S.Ct. at 583 (absolute immunity relating to common law torts); *see also Harlow,* 457 U.S. at 8, 102 S.Ct. at 2736 (discussing reasons for qualified immunity).

The entire official immunity doctrine is directed at reconciling two important and conflicting considerations:

[O]n the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding governmental officers against the harassment and inevitable hazards of vindictive or ill-founded damage suits brought on account of action taken in the exercise of their official responsibilities.

*Barr v. Matteo,* 360 U.S. 564, 565, 79 S.Ct. 1335, 1336, 3 L.Ed.2d 1434 (1959) (absolute immunity for common law torts). The Supreme Court has clearly recognized that application of the official immunity doctrine carries with it a great cost; not only are injured parties denied compensation, but the doctrine also enables the responsible individuals to avoid being held accountable. *Westfall,* 108 S.Ct. at 583. These costs must be balanced against the costs of allowing individuals to seek relief against governmental officials. As the *Harlow* Court noted, "it cannot be disputed seriously that claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens form acceptance of public office." *Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736.

In Counts I through III of his complaint, plaintiff asserts that the conduct of the defendants named therein violated his constitutional rights and amounted to a constitutional tort. Where a tort action alleges violations of constitutional rights, the doctrine of absolute immunity is not applicable. *Butz v. Economou,* 438 U.S. 478, 495, 98 S.Ct. 2894, 2805, 57 L.Ed.2d 895 (1978). However, the *Butz* Court also recognized that public policy considerations require that some limitation must be placed on the potential liability of federal executive officials. *Id.* at 506, 98 S.Ct. at 2910. The Court held that where constitutional violations are at issue officials will generally enjoy qualified immunity. *Id.* at 507, 98 S.Ct. at 2911.

In *Harlow v. Fitzgerald, supra,* the Supreme Court enunciated the proper standard for evaluating an assertion of qualified immunity. The *Harlow* Court adopted an objective test to determine whether the doctrine of qualified immunity applies.[6] In formulating this test, the Court placed great emphasis upon the need for maintaining a proper accommodation between the competing values of individual rights and the social costs of exposing officials to suit. The Court was particularly concerned that exposing officials to personal liability would inhibit officials from aggressively discharging their duties. *Id.*

With these concerns in mind, the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate *clearly established* statutory or constitu-

---

**6.** Prior to *Harlow,* a determination as to the validity of a defendant's assertion of qualified immunity required an analysis of both subjective and objective elements. *See e.g. Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The *Harlow* Court, noting that the existing standard was not adequately shielding federal officials from suit and its accompanying burdens, set out to fashion a test that focused primarily on "objective" factors.

tional rights of which a reasonable person would have known." *Id.* 457 U.S. at 818, 102 S.Ct. at 2738 (emphasis added). The Court of Appeals for this Circuit has held, however, that the Supreme Court did not intend to entirely preclude inquiry into a defendant's "subjective" motivation. For example, in *Martin v. D.C. Metro. Police Dep't,* 812 F.2d 1425, *modified,* 817 F.2d 144 (D.C.Cir.1987), the Court of Appeals concluded that application of a *purely* objective standard of inquiry is inadequate. The *Martin* Court held:

> when the governing precedent identifies the defendant's intent (unrelated to knowledge of the law) as an essential element of plaintiff's constitutional claim, the plaintiff must be afforded an opportunity to overcome an asserted immunity with an offer of proof of the defendant's alleged unconstitutional purpose.

*Id.* at 1433 (citations omitted). The Court of Appeals emphasized that such a limited inquiry into defendant's subjective intent is warranted only in instances where the controlling substantive law makes the official's state of mind an essential element of plaintiff's constitutional claim. *Id.* n. 18. This Circuit recently summarized the governing standard:

> Inquiry into subjective intent unrelated to knowledge of the law is permissible where the constitutional violation turns on an unconstitutional motive. Nonetheless, under this court's heightened pleading standard, in order to obtain even limited discovery, such intent must be pleaded with specific, discernible facts or offers of proof that constitute direct as opposed to merely circumstantial evidence of the intent.

*Siegert v. Gilley,* 895 F.2d 797, 802 (D.C. Cir.1990).

Thus, the proper resolution of defendants' assertion of immunity turns on the nature of Gaubert's claims. If it is Gaubert's contention that the actions taken by these regulatory officials were objectively unlawful, he must plead that the rights alleged to have been violated were "clearly established" at the time of the alleged im-

proper conduct. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). If the alleged constitutional violation turns on some element of subjective intent, than Gaubert must satisfy the heightened pleading standard adopted by this Circuit. *See Siegert, supra.*

A liberal reading of the complaint leads this Court to conclude that the constitutional claims advanced by plaintiff involve both subjective and objective elements. This Court, however, has determined that plaintiff's allegations fail to defeat the defendants' assertion of qualified immunity.

### A. Violations of "Clearly Established" Rights

In *Harlow,* the Supreme Court held that to overcome an assertion of qualified immunity the constitutional rights alleged by plaintiff to have been violated must have been "clearly established" at the time of the alleged wrongdoing. The Court has subsequently recognized that the application of this standard depends substantially upon the level of generality at which the relevant "legal rule" is identified. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

█ Here, in Counts I and II, plaintiff asserts causes of action that are deemed to have their bases in the Due Process Clause. In Count I, plaintiff asserts a substantive due process claim. It is plaintiff's position that the actions of the officials regarding the entire IASA acquisition were "arbitrary, irrational, offensive and shocking to the conscience." Complaint ¶ 92. Count II charges that the defendants violated plaintiff's right to procedural due process by fraudulently inducing him to agree to the "neutralization agreement" which in effect removed plaintiff from management involvement in IASA. Plaintiff contends that this was improper because he had a liberty interest in managing the savings and loan which could not be taken away without resort to the full panoply of procedures that due process requires. Both these Counts are infected by the very infir-

mity that the Supreme Court focused upon in *Anderson*.

The *Anderson* Court expressed concern about the ability of plaintiffs to transform the rule of qualified immunity "into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038. The Court reasoned, "Such an approach, in sum, would destroy 'the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties,' by making it impossible for officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Id.* (quoting *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1985)). Specifically, the Court engaged in an analysis of legal claims which have their basis in the Due Process Clause. The Court noted that the right to due process is clearly established by the Due Process Clause, and thus "there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right." *Id.* However, the Court determined that merely alleging violations of such abstract rights is not sufficient to withstand an assertion of qualified immunity. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Id.* 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted).

Therefore, the crucial question becomes whether the actions that plaintiff alleges the defendants have taken are those which a reasonable official could have believed to be lawful. *Anderson*, 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6. This Court is convinced that these bank regulatory officials could have reasonably believed that their conduct was lawful. These officials throughout their dealings with plaintiff were seeking to carry out their duty to maintain a sound thrift system. To achieve that end, plaintiff Gaubert was contacted to determine whether he would be interested in acquiring Investex. Mr. Gaubert does not contend that he was singled out for any devious purpose. Plaintiff Gaubert is a sophisticated business person who has experience in the thrift industry. Plaintiff also had the benefit of counsel throughout his negotiations and dealings with the bank regulatory officials named in his complaint.

In Count I, plaintiff asserts that these regulatory officials "pushed the Investex merger on Gaubert and IASA." Complaint ¶ 91. However, Mr. Gaubert was under no obligation to enter into any agreements with these officials. In Count II, it is charged that the officials improperly induced plaintiff into entering into the "neutralization agreement." It is plaintiff's position that there is a formal removal procedure which defendants should have instituted if they wanted to remove Gaubert from the management of IASA. Even assuming this to be true, the fact that Gaubert voluntarily entered into a contractual agreement that preempted the application of formal procedures undermines the validity of his present claim. Given the fact that citizens are free to waive their right to a due process hearing, *D.H. Overmyer v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), these banking officials can not now be said to have knowingly violated clearly established rights of the plaintiff.

Counts I and II name only staff members as defendants. It is not alleged that any Board member or presidentially appointed official was involved in these claims. Nor is it alleged that any of the defendant staff members were pursuing courses of conduct for the purpose of self enrichment or that they in any way acted corruptly in their official duties for personal benefit. At best, it can be said they made mistakes in the discharge of their duties. To accept plaintiff's premise that government officials can be held personally accountable for untold millions of dollars in damages every time they erred would make it virtually impossible to attract qualified people into

government. This would be particularly so in areas like the thrift industry where the risks are great and an improvident governmental decision can bring about losses in the hundreds of millions of dollars. To accept plaintiff's position would in effect mean career as well as other government employees would have no right to be wrong. This is a standard that is much too high for a government employee and is the very reason that such officials have been cloaked with qualified immunity.

■ Count III of the complaint alleges that defendants, Gray, Fairbanks, Black, Stewart, and certain yet to be identified individuals, intentionally released and distributed confidential agency information relating to Gaubert and IASA to the media and members of Congress. Complaint, ¶ 100. It is Gaubert's contention that this conduct violated his First Amendment right to petition Congress. Plaintiff states that the defendants engaged in this conduct in an effort to undermine his efforts to call to the attention of Congress the weaknesses in the banking regulatory system. This claim is untenable given that the disclosure of such information does not violate a "clearly established constitutional right." Although plaintiff like any other citizen has the right to petition Congress, it is by no means clear that the disclosure of information by regulatory officials violates this constitutional right. This Court is not convinced that in "light of preexisting law" it would have been "apparent" to these regulatory officials that the disclosure of information amounted to a violation of Gaubert's constitutional rights. Plaintiff cannot point to any case law which holds that the alleged misconduct of defendants amounts to a constitutional violation. Moreover, under the facts alleged in Count III this Court is not prepared to award damages where officials of a government agency provide information to the United States Congress and the press. There are no facts alleged to show that the defendants named in Count III personally benefitted from the release of this information or that they were not acting pursuant to the mandates of their offices.

In making the determination that plaintiff's constitutional tort claims must be dismissed, this Court has carefully considered the overriding concerns identified by the *Harlow* Court. Particularly, the impact of this suit on future regulatory activity must be considered. As this Court has stated:

> Even if the defendants in this case had made certain mistakes, bank regulatory officials must have certain leeway in discharging their duties in order for the regulatory system to function effectively. Mistakes incurred in carrying out governmental responsibilities must be tolerated or otherwise the regulatory system will not be able to function as it must.

*Biscayne Federal Savings & Loan Assn. v. Pratt*, 646 F.Supp. 371, 378 (D.D.C.1986). Here, as in *Biscayne*, the regulatory officials being sued were acting in their governmental and not their personal capacities. Subjecting these individuals to the risk of enormous damage awards would not in any way serve the public interest. Rather, it would only make the regulatory mechanism of the government dysfunction.

B. Allegations of Unconstitutional Motive

■ Plaintiff alleges that defendants Raiden, Stewart, Bonchak, and other unknown regulatory officials were prejudiced against him and that this prejudice motivated these individuals to take actions aimed at injuring the plaintiff and reducing the value of his business investments. Complaint, ¶ 25. The source of this prejudice was that plaintiff Gaubert, prior to the events at issue in this case, had criticized Bonchak and others for their lax supervision of Empire Savings and Loan Association, a Texas based thrift. Gaubert also brought his criticisms to the attention of Congress. *Id.* ¶¶ 20–25. A second source of this alleged prejudice relates to a dispute which Gaubert had with Rosemary Stewart, Director of the Bank Board's Office of Enforcement. Gaubert believed that Stewart had assigned Marianne Roche, an Office of Enforcement attorney, to investigate IASA's involvement in the conversion of Metropolitan Federal Savings

and Loan of Dallas, Texas, from a state-chartered mutual to a state-chartered public stock association. It was Gaubert's contention that Ms. Roche should have been disqualified from working on this matter since she had once worked for a private law firm that represented Metropolitan in an action against IASA on the same issue. Additionally, Gaubert believed that the FHLBB improperly provided Metropolitan with internal bank examination reports on IASA. IASA initiated court proceedings to prevent the disclosure of this information. *Id.* ¶¶ 16–19. In the instant action, plaintiff asserts that these prior disputes with regulatory officials motivated the named defendants to act improperly and in bad faith. Here again, this Court concludes that plaintiff's allegations of unconstitutional motive fail to satisfy this Circuit's heightened pleading standard. *See Smith v. Nixon,* 807 F.2d 197, 200 (D.C.Cir.1986); *Hobson v. Wilson,* 737 F.2d 1, 29–30 (D.C.Cir.1984).

With its recent decisions in this area, the Court of Appeals has elaborated on the demanding nature of the heightened pleading standard. The Court of Appeals has erected such a demanding pleading standard so "that bare allegations of improper purpose, like the bare allegations of malice rejected in *Harlow,* do not suffice to drag officials into the mire of discovery." *Smith v. Nixon,* 807 F.2d at 200. As the Court of Appeals has declared: "[T]o avert dismissal short of trial, [the plaintiff] must come forward with something more than inferential or circumstantial support for his allegation of unconstitutional motive. That is some *direct evidence* that the official's actions were improperly motivated must be produced if the case is to proceed to trial." *Martin v. D.C. Metro Police,* 812 F.2d at 1435.

Plaintiff has failed to meet this heavy burden. Gaubert merely points to his past problems with bank regulatory officials and proceeds to infer that this is the basis for the prejudice which is alleged to have infected the decisions of the defendants. *See* Complaint, ¶¶ 1–25. Such naked conclusory allegations cannot provide the basis for subjecting government officials to the burdens of discovery or trial. *Siegert,* 895

F.2d at 803–4. (citation omitted). Since Gaubert has failed to allege any direct evidence of unconstitutional intent, "his claim must be dismissed immediately." *Whitacre v. Davey,* 890 F.2d 1168, 1171 n. 4 (D.C.Cir.1989).

## V. COMMON LAW TORT CLAIMS

■ A federal district court, being a court of limited jurisdiction, can only hear cases that contain claims arising under one or both of Article III's bases for jurisdiction—diversity or federal question. Additionally, if a plaintiff's pleadings disclose a substantial federal claim, a federal court has the power to hear pendent state claims that "derive from a common nucleus of operative fact" and if they are such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The exercise of jurisdiction over such related state law claims is known as pendent jurisdiction. *See* 13B Wright & Miller & Cooper, Federal Practice & Procedure § 3567.1 (1984). However, "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.*

Counts IV through VIII of plaintiff's complaint allege various common law torts. Because plaintiff's constitutional claims have been dismissed, this Court in its discretion declines to exercise pendent jurisdiction over these state law based claims. *See Id.* 383 U.S. at 726, 86 S.Ct. at 1139. As the *Gibbs* Court declared:

Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Id.*

Accordingly, in the exercise of this Court's discretion, these common law based

claims also will be dismissed.[7]

---

**7.** The Attorney General has filed a notice of substitution of the United States as defendant. The exclusive remedy for common law torts alleged to have been committed by an "employee of the government," lies against the United States under the Federal Tort Claims Act ("FTCA") as recently amended. 28 U.S.C. § 2679(b)(1) (1988). Pursuant to these recent amendments, the Attorney General or his designee is authorized to certify that an employee was "acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1). Such certification was made in this case and absent the disposition of plaintiff's constitutional claims would have been granted.